Josefa Colón, etc., Plaintiff and Appellant, *v.* Heirs of Alberto J. Tristani, Defendants and Appellees. *

No. 5659.  Argued June 24, 1932.—Decided December 9, 1932.

* Note.—An appeal taken from this decision to the U. S. Circuit Court of Appeals for the First Circuit was dismissed for want of jurisdiction.  See 71 F. (2d) 374.

**164**

*R. Atiles Moreu* and *Erasto Arjona Siaca* for appellant.   *A. S. Poventud* for appellees.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

Josefa Colón, as mother with patria potestas over her minor acknowledged natural son, Alberto Colón, brought suit against the Succession of Alberto J. Tristani, composed of his heir and mother Julia Quesada Mandry, widow of Tristani, wherein she prayed that the said minor Alberto Colón be declared the acknowledged natural son of Alberto J. Tristani. The complaint sets forth that the said Alberto J. Tristani, around the year 1922 had a love affair with the plaintiff Josefa Colón in the city of Ponce; that they cohabited and lived in a public state of concubinage in several places, among others at 69 Victoria Street; that as a result of said cohabitation and public concubinage, which lasted for several years, was procreated the minor Alberto Colón, who enjoyed the uninterrupted condition as of an acknowledged natural son of his father Alberto J. Tristani, and that the latter supported him, paid the rent of his home, cared for him, and treated him publicly, intimately, and ostensibly as his acknowledged son. It is alleged, moreover, that the defendant Julia Quesada Mandry was declared to be the sole and universal heir of the said Alberto J. Tristani, and the nullity of the judgment rendered in said case is prayed.

The defendant denied in general terms each and everyone of the facts averred in the complaint, and at the close of the production of the evidence, by leave of court, presented as a special defense the averment hereinafter quoted:

"That on the dates mentioned in the amended complaint and most especially at the time of the conception by Josefa Colón of the child Alberto Colón, in May, 1923, during all of that year and up to his death, October 20th, 1928, the said Alberto J. Tristani was afflicted with syphilis taboparesis which prevented him from procreating on or before the dates already mentioned."

The lower court dismissed the complaint, without special pronouncement of costs, because it considered that the facts alleged therein had not been proved.

From the opinion rendered by the lower court we quote as follows:

"The theory of the complaint, in accordance with its averments, is based on paragraphs 2 and 3 of section 193 of the Civil Code now in force, that is, that the plaintiff was known to have lived in concubinage with Alberto J. Tristani, both during her pregnancy and at the time of the birth of the child Alberto Colón, and that the latter has uninterruptedly enjoyed the condition as of a natural child of Alberto J. Tristani justified by acts of the same father.

"The court, weighing the evidence produced by both parties to sustain and destroy the above stated theory, is of the opinion that the plaintiff has failed to prove the essential averments of her complaint, with strong and convincing evidence in any of the aspects of said theory. The court wishes to state that it has reached this conclusion ignoring the expert testimony presented by the defendant in support of the allegations contained in her special defense.

"In our opinion, it has been shown that the plaintiff Josefa Colón, around the years 1922 to 1924 was the mistress of Alberto J. Tristani and that the latter visited her frequently at night, but in no wise has it been shown that Alberto J. Tristani lived in concubinage with Josefa Colón, for he had his home in the house of his mother, the defendant herein. It has been shown that Alberto J. Tristani gave money to the plaintiff and aided her to pay the rent of the house together with Mr. Fortier, who lived in concubinage with the plaintiff's sister, but there has been no evidence to show that Tristani lived publicly with the plaintiff, and on the contrary the whole evidence tended to show that while he visited her he always left the house between one and two in the morning. It has been shown, furthermore, that the plaintiff, prior to Tristani, cohabited with Felipe Maldonado and that even at the time of her relations with Tristani, other men visited her house. Antonio García and Atilano Garay, two

hackmen, testified that around the years 1922 to 1923 they used to take passengers to the house of the plaintiff who lived with her sister Margot; that these women were known as the 'Guarapito girls' and that they enjoyed the reputation of admitting men to sleep with them, Garay testifying that Tristani was among the persons that he took there several times. Antonio Iglesias also testified that in the years 1922 to 1923 he lived near the house of the plaintiff and that he went out with her in the year 1923 to a beach known as 'Los Meros' and to another known as 'Quintana Baths' and that he had sexual intercourse with her. It is true that both the plaintiff and the witness Fortier denied these facts when they testified in rebuttal, but the plaintiff is an interested party and as to Mr. Fortier, the court does not doubt the good faith with which he testified in this case, but it can not forget that he was the paramour of the plaintiff's sister, against whom charges similar to those made against her sister were also made. Besides, witness Petrona Suárez, of the plaintiff, testified that even during the life of Tristani the plaintiff went to New York to live and that she had been there for about two years and had a son from another man. If we take into consideration all the facts connected with the life of the plaintiff, that before living with Tristani she lived with Maldonado and that while she lived with Tristani she left her son in Puerto Rico with her sister and sailed for New York and there had another son with another man, and lived there on October 20th, 1928 when Alberto J. Tristani died in Philadelphia, it must be agreed that the court can not give credit to the supposed morality of the plaintiff and that the above stated evidence for the plaintiff establishes a strong doubt in the mind of the court as to its veracity.

"It has been shown that Tristani paid the fees of the midwife who attended the plaintiff and that he showed isolated acts of affection toward the minor Alberto Colón, but the court is of the opinion that the evidence as a whole does not establishes that the said minor uninterruptedly enjoyed the condition of a natural recognized son of Tristani, in accordance with the strong and convincing evidence required by precedents in cases of this sort."

The appellant maintains that the lower court committed three errors. For the purpose of their consideration these errors may be condensed into one. It is alleged that the judgment rendered is not in accord with the evidence, that the court erred in holding that said evidence was insufficient, in

not considering it in all its extension and in failing to exercise its sound discretion.

As we are dealing with a case whose final outcome depends on the weight given to the evidence, and the lower court held that the facts averred in the complaint have not been proved, we shall make a history of the legislation in force in Puerto Rico up to the present, with regard to the acknowledgment of natural children, for in our opinion a study of the evolution of this legislation may aid us in certain aspects in the decision of this case from the standpoint of the evidence adduced.

In accordance with the laws of the *Partidas,* by natural child is understood: "that procreated with a mistress or with a free or unmarried concubine, who not being a virgin or an honest widow, is had alone by an unmarried man, in a position to marry her at the time the child is conceived." (L. 2, tit. 14, *Partida* 4; l. 1, tit. 15, *Partida* 4; and l. 8, tit. 13, *Partida* 6.).

There is a difference between the Roman Law and that of the *Partidas* and this difference is that the former requires that the concubine live in the house of her paramour, while the *Partidas* contain no express provision on this point.

The Law 11 of Toro (l. 1, tit. 5, book 10, *Novísima Recopilación*) provides that a child shall be considered as natural when at the time of his birth or of his conception his father was able to marry his mother without dispensation, provided the father acknowledged him as such child, even if he did not have in his house the woman who engendered it or though she was not single.

Investigation of paternity was allowed in Spain while the Law 11 of Toro was in force. The Spanish Civil Code was then adopted and a very important innovation was then introduced with regard to the admission of evidence to justify the filiation of a natural son. The basic law for the framing and publication of said code says in its 5th basis that the investigation of paternity shall not be allowed except in cases

of crime or when there is a writing of the father wherein his indubitable will of acknowledging the child as his own is deliberately made for that purpose or when the minor enjoyed that condition. This 5th basis provides that 'the investigation of maternity shall be allowed,' the natural child being thus free to investigate the origin in so far as the mother is concerned.

Section 135 of the Spanish Code, in accordance with the basic law, compels the father to acknowledge his natural child in the following cases:

"The father is obliged to acknowledge the natural child in the following cases:

"1.—When an indisputable paper written by him, expressly acknowledging his paternity, is in existence.

"2.—When the child is in uninterrupted enjoyment of the status of a natural child of the defendant father, justified by direct acts of the said father or of his family.

"In cases of violation, ravishment, or rape, the provisions of the penal code shall be observed with regard to the acknowledgment of the issue."

Commenting on these provisions of section 135, Mucius Scaevola, at page 350 of vol. 1 of his *"Jurisprudencia Civil,"* says:

"It is a frequent fact that persons, contrary to the natural law, oblivious of blood ties, underrate the beautiful title of father and forget the duties inherent to paternity.

"The law has thought of this cruel and repulsive action and has allowed or given the child the means to secure his personality, his status. But the progressive law, always fatal, has not been followed in this respect; the Spanish law has done the opposite; from the investigation of paternity, ample expression of the Law 11 of *Toro,* it has gone back to the express provisions of Section 135, which limits the compulsory acknowledgment of a child by his natural father to the two cases therein included. Instead of going from a simple to a complex situation, or from a particular to a general one, Spanish legislation has done entirely the opposite, thus deviating absolutely from the path marked by modern juridical science."

In accordance with the Law 11 of Toro, acknowledgment could be express or implied. The child could investigate his origin, all legal means of evidence to establish his paternity being permissible. The Civil Code prescribes limitations which do not allow the investigation of the acts of the parents and which confine themselves to the direct and express acts existing between parent and child. "In the absence of proof to show this relation," says Scaevola at page 357 of the work cited, "between parent and child, the latter will continue to be the child of chance and the unknown, even if it were shown that there existed sexual relations between a man and a woman and that the claimant was born as a result thereof. Such evidence will serve to prove the acknowledgment of the mother, but not the affirmance of paternity. The natural father, under the law, is a supernatural and miraculous being, surrounded and covered by the shadows of uncertainty, who may only be known when he takes the trouble of coming down from the throne of sexual passion in order to spread, either through pity or mercy, over the head of his child the valued extreme unction of filiation."

Manresa, the commentator, at pages 464–465 of vol. 1 of his Commentaries on the Spanish Civil Code, expresses himself thus:

"The uncertainty and mistery adduced in the relation of paternity to deny its investigation is not real, for the same exists in legitimate paternity; and it is not true either that an absolute certainty may be asked in any legal situation; on the contrary, there is in them nothing more than an absolute certainty, on which rests a favorable presumption in law.

"As correctly stated by Cimbali, this happens even when an attempt is made to establish the nexus of natural filiation with respect to the mother, of whom the moment of delivery may be established with certainty at times, though not in the same absolute manner the identity of the child born with that in whose favor filiation is declared by law. (1) The same presumption—unless evidence to the contrary is adduced—governing legitimate paternity, ought to exist with regard to the person who has had illicit sexual intercourse

with the mother and this presumption should benefit the child, as it happens in various countries.''

Section 189 of our Code, as enacted in 1902, provides:

''A father is obliged to recognize his illegitimate child in the following cases:

''1.—Where there be an authentic statement in writing made by him expressly recognizing his paternity.

''2.—When publicly or privately he has shown that it is his child, or has called it as such in conversation, or looks after its education and maintenance.

''3.—When the mother was known to have lived in concubinage with the father during the pregnancy or birth of the child, or when the child was born while his parents were engaged to be married (*relaciones amorosas.*)

The third paragraph of the above quoted section introduces an innovation of a fundamental character, inasmuch as it allows the investigation of paternity. This paragraph establishes the presumption of paternity when the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child. This is in fact a presumption similar to that established in the contract of marriage, with the difference that in the latter the agreement of the parties sanctioned by the solemnity of the marriage establishes the presumption, while in the concubinage the relation existing between the parents is established by means of evidence. That is to say, in order that the court may reach the conclusion that there is a concubinage it is necessary to show that a man and a woman had sexual intercourse and that they have complied with the other provisions specified by law. In this case the child can not be declared to be a natural son without investigating the acts that have taken place between the parents, the relations existing between one and the other. In cases of uninterrupted condition as of a natural child, the direct acts of the father and child are to be considered in order to determine the filiation. Besides, as a question of fact, investigation of

paternity has been constantly allowed in Puerto Rico. The mother has always testified extensively about her sexual relations with the putative father in an action for the acknowledgment of a natural son. Section 38 of the Law of Evidence provides that all persons, without exception, otherwise than is specified in sections 39 and 40, who having organs of sense, can perceive, and perceiving, can make known their perceptions to others, may be witnesses. Section 40 provides the cases in which a person may not be examined as a witness and these exceptions do not comprise the testimony of a mother regarding sexual intercourse with the alleged father of her son.

Said section 189 of the Civil Code, as amended in 1911, still contains the provision that establishes the presumption of natural son when the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child. Our laws do not prohibit the investigation of paternity and once this obstacle has disappeared, we are of the opinion that the means of evidence in Puerto Rico are at present much wider than those existing under the Spanish Civil Code. Our present law is more humane and liberal in striking out the obstacle which the commentator Scaevola designates as a juridical barbarism. Let us see what this commentator says at pages 358 and 359, vol. 1, of the work cited:

"From the affirmative acts showing the uninterrupted condition as of a natural child, nothing may be said; they imply the mere discharge of the duties imposed on the father by section 154 of the Code; i. e., to support and educate the child and to have it in his company. The Supreme Court limited itself to a strict compliance of the law; to deny paternity in the cases mentioned in the respective judgments —there being direct acts of the father tending to show the recognition of filiation—would have been illegal and preposterous; filiation would have been disregarded solely by acting arbitrarily, at least in some of the cases.

"The other judgments—those denying filiation—involve a social iniquity, resulting from judicial barbarism (the failure to admit the

investigation of paternity). Of course, neither small presents nor acts of mere philantrophy give any weight by themselves, in such a manner as to attribute to the person executing them the quality of father of the child favored by one or the other, because we all make presents and we all practice charity once in a while; but such acts, added to evidence of sexual intercourse with the mother, are almost unequivocal signs of paternity. Each of said acts lacks decisive force to generate filiation, but taking them in their entirety are sufficiently strong to create such status, and do create it, even though the status may end in the inexorable hands of the law.''

Scaevola, desirous of giving a formula to soften the provisions of section 135 of the Spanish Civil Code with regard to evidence of the uninterrupted condition as of a natural child, expresses himself thus at pages 362 and 363, vol. 1., of his *"Jurisprudencia Civil"*:

''By the side of such expansive rule like the admission of all evidence to justify the uninterrupted condition as of a natural child, there exists the harsh and fast rule of the irrelevancy of the evidence about the origin of the child, imperative corollary,—as admitted by the judgment affirming it—of the rule prohibiting the investigation of paternity.

''With regard to the second, it is interesting to state some considerations which reveal its real value and prevent such a strict and severe interpretation that lead to its own denial.

''Given the prohibition of investigating who is the father, such investigation may be considered irrelevant when it is taken as an object, that is, when the object of the plaintiff's claim is to find out who was his progenitor; and the only evidence admissible is limited to such matter.

''But it ought to be considered as relevant in case it is one of the probatory means introduced in the case, because showing the origin of the child, joined to the acts of the father toward him, even if such acts are remiss, constitute as a whole the most evident sanction of paternity.

''Thus, the rule of which we have been speaking is of no absolute value, and on the contrary a very limited one should be given thereto. It is always advisable whenever natural filiation is involved, to produce evidence with regard to the relations existing between the parents, and of paternity on the part of the man, as a basic element, and to complement it with other evidence relative to the acts of the father.

The first thing that has to be shown is that there exists a father, and then the acts done by him as such."

As may be seen, the Spanish conmentator is of the opinion that the investigation of paternity should be considered as relevant, if it is one of the probatory elements necessary to the case, and ends by saying that "the first thing that has to be shown" is that a father exists, and then the acts done by him as such.

Paternity and filiation arise from the conception of the child and his birth. The law requires certain conditions in order that the natural act of conception and birth of the child may be had and considered as a right. When these conditions have occurred, filiation is established, but in order that it may acquire legal life the formality of the acknowledgment is necessary. The natural condition of the child is always a fact; the acknowledgment is the consecration of that fact, the solemnity proclaiming that the provisions of law have been complied with, and places the child in a position to bring suit to ratify the rights corresponding to him as such.

For example, once the uninterrupted condition of a natural child has been established by direct and continuous acts of the father, it is our opinion that the latter can not divest the child of the status so acquired. As Escriche correctly says, acknowledgment is not a liberality properly speaking, but the declaration of a status to which the law grants certain advantages; but once this declaration of paternity is made, the child acquires a status of which he can not be divested.

The conclusions that we have established compel us to study the provisions of the code which refer to the uninterrupted condition as of a natural child. The adjective "*continuo,*" according to Scaevola, has several meanings and in the case of section 135 it may not be taken to mean "uninterrupted", but as "a thing that follows another," and it is to be interpreted with the word "constant", which means per-

174

severance or repetition of acts. In our opinion, the word "*continuo*" (uninterrupted) should be taken to mean a series of acts, a set of facts carried out by the person from whom the acknowledgment is claimed, sufficient, if considered as a whole, to constitute the uninterrupted condition of a natural child. Once these series of acts have been carried out for a reasonable length of time, the father should not be allowed to revoke with his subsequent acts the acknowledgment priorly made by him. To establish a contrary principle would be equivalent to authorize the father to set aside certain facts which should have been insufficient for the child to obtain his acknowledgment, if the action had been brought prior to the date in which the relations existing between them had been interrupted.

The decisions of the Supreme Court of Spain require a strong, vigorous, and convincing evidence, revealing with indubitable certainty the blood ties which join him with the person from whom he demands acknowledgment. The severity of the decisions of Spain has its explanation in the prohibition regarding the investigation of paternity, which prevents that these blood ties be established with evidence regarding the relations of an intimate character existing between its alleged parents. But when the natural condition of the child may be established by evidence of his paternity, once the trial court considers that this fact is proved, judicial discretion should be humane, judicious and liberal, without going beyond the limits of the law, in order that the natural child may find feasible the way to make effective the duties contracted by his father of acknowledging him once the child is engendered and to demand the rights inherent to his filiation. Paternity is an element which may not be ignored by the trial judge, when evidence to that effect has been presented, in order to reach a conclusion. This evidence could have been ignored in Spain, where the child was not allowed to investigate his origin and where he "continues to be a legitimate child of chance and the unknown," as correctly

stated by Scaevola, "although it may be shown that there existed sexual relations between man and woman and that the claimant was born as a result thereof." This may not happen at present in Spain, where the new Spanish Constitutions provides that filiation can not be the ground of legal privileges, imposes on the parents the same duties toward their children, whether legitimate or illegitimate, and leaves to the civil laws the regulation of the investigation of paternity. This should not happen in Puerto Rico where the investigation of paternity is not prohibited by our laws.

We shall examine now the evidence adduced in this case.

Josefa Colón testified, among other things, that for four years she lived in concubinage with Alberto Tristani, under his protection and support; that she began to cohabit with Tristani in 1922; that during that time she gave birth to a child who was named Alberto Colón and that he was given this name because his father so ordered; that during the whole period of gestation, both while the child was in her womb and while it was born, she lived with Alberto Tristani; that the latter went to her house whenever he pleased, during the day the same as during the night; that he provided her with food for the child, protected her and paid the rent of her house; that she had sexual intercourse with Alberto Tristani and received some written documents from him, as well as a photograph of Tristani which he gave her; that at the time of delivering the child she was attended by Victoria Carrillo, a midwife, and that Alberto Tristani paid for the services of the latter; that her child was born on January 16th, 1924, at 12:30 p. m. that Tristani saw the child in the evening; that he came to the house and was very glad with the baby because he wanted a boy and that Petrona Suárez and Peyín Fortier, who had a love affair with her sister, were there. That Tristani paid the food and clothing of his child, whom he treated affectionately and considered him as such; that Peyín Fortier was in her house because he had an affair with her sister, who lived with her and with a younger sister

in her house; that when her sister was not acquainted with Peyín Fortier, the deponent paid the $10 of the rent of the house, and that when her sister met Fortier the latter agreed to pay half of the rent; that before having that affair with Tristani she lived in concubinage with Felipe Maldonado; that the latter affair lasted till 1920; that she lived for a year and a half or two years with Maldonado and after that she separated from him and went to the house of her family; that she had no relations with any other man; that she lived for about six months with her family and after that she met Tristani; and that after that she did not live again with Felipe Maldonado nor had relations with any other man; that when her relations with Tristani·began she lived in a small house with her sister Margarita, who is known as Margot; that while she lived on Protestant Street the house belonged to her sister and as it was not confortable she told her sister to sell it; that it was the intention of Alberto to rent a bigger house and to pay for it; that then they moved to Victoria Street; that while she lived on Protestant Street her sister was not acquainted with Peyín Fortier, and that it was when they moved that she met him and that Fortier agreed there to contribute with $5 for the rent; that at the time of the conception and birth of her son Alberto, she was single and that Tristani was single also. After this, the deponent was subjected to an examination with regard to the letters or documents presented in evidence, which the deponent said had been written by Alberto Tristani. Subsequently the defendant produced oral testimony to show that the handwriting on these documents was not that of Alberto Tristani. The defendant, Julia Quesada, and Carlos Negrón, who was in charge of the books of account of Tristani's firm, testified on this point. Both witnesses said that they were acquainted with Tristani's signature and that the documents offered in evidence were not similar to Tristani's handwriting and had not been written by him. The plaintiff Josefa Colón also testified that she was acquainted with Tristani's handwriting

and that the handwriting on the documents offered in evidence was that of Alberto Tristani. The judge admitted the evidence in order to give it whatever probatory value it might have.

Petrona Suárez testified, among other things, that she was a neighbor of Josefa Colón; that she lived next to the latter's house; that she was acquainted with Alberto Tristani, who visited frequently, during the day the same as at night, the house of Josefa Colón with whom he had a love affair; that Tristani conducted himself as the father of the child Alberto; that he bought him presents and paid the necessaries of the child and of Josefa Colón. The testimony of this witness is extensive and confusing. She contradicts herself; for example, when she tries to explain the time in which Tristani left the house of Josefa Colón and when she attempts to fix the date in which Josefa Colón came to live next to her house. The witness is caught in her own net and she is unable to explain one thing or the other. According to the manner she expressed herself and to the contradictions in which she incurs, Petrona Suárez could not have left a good impression in the mind of the trial judge.

Luis Santiago testifies, among other things, that he was an employee of Alberto Tristani in the years 1922 to 1923; that he used to go with Tristani in the bus or in the car to the house of Josefa Colón and stopped their and remained in the car, and Tristani went in; that that was how he became acquainted with Josefa Colón; that whenever Tristani sent a note or letter to Josefa Colón and told him "take this to so and so," he did so; that he left that position owing to a misunderstanding he had with Carlos Negrón, an employee of Tristani and that when he quit the position Josefa Colón was already pregnant.

Carlos Negrón, a witness for the defendant testified, among other things, that Luis Santiago was discharged from the firm by him personally because Santiago failed to do his duties, precisely at the time that Tristani was abroad.

Pedro José Fortier testifies, among other things, that he is marshal of the municipal court of Ponce; that in the year 1923 he began to have relations with a young woman named Margot, sister of Josefa Colón, who at that time lived on Victoria Street and who at present resides in New York; that he visited the house frequently and that when he began to visit it, Josefa Colón had been living for a long time with Alberto Tristani, of whom he was a friend; that every night, or very frequently, he went to the house where the two sisters resided and there he met Alberto; that the house was so small that it allowed him, to hear whatever was said in a natural tone of voice; that the house had two small sleeping rooms; that one was occupied by Margara and the other by Josefa; that he gave $5 to Margara to pay half of the rent of the house; that Alberto paid $5 and he paid $5; that they met in that house every night; that some times, as they were friends, Alberto invited him to go out together and left him near the corner where the witness lived and Alberto went on because he lived farther ahead; that then Josefa became pregnant; that the moment of delivery came and he remembers just as if it had happened yesterday the day when the child was born; that the night before he went to her house as customary and there he found Alberto; that they greeted each other, and when he noticed that Josefa was not there he inquired about her and Alberto himself told him that Josefa was feeling the pangs of childbirth; that the following day, in the afternoon, he went to the house of Josefa Colón and found that the child had been born some hours before; that he went again in the evening and found Alberto, who generally called him Don Peyo, as he is called by some of his friends; that Alberto said; "Don Peyo, what do you say; you have come to see the baby"; that they spoke about that, went into the room again and there stayed with him for a while and then left; that when the child got sick, Alberto scolded the mother because she did this or failed to do that and told her also in his presence to com-

municate with Jaime, referring to Doctor Jaime Costas; that the child caressed Alberto and Alberto caressed the child and took him in his arms also; that then he had a misunderstanding with the sister of Josefa Colón and their relations ended and after that he did not visit the house as frequently as he did before, although the witness lived near the corner of Victoria Street, and some times met the child, his mother and his aunt and they spoke to him about the child, and caressed him and spoke to him of their intention to leave for the United States, as they did; that sometimes while the witness was in the house, one of Tristani's employees approached the house, called up Josefa, she came out and the employee handed her an envelope or something which looked like money; that he does not know what he sent her or gave her, or anything of the sort; that he does not know what the envelope contained; that it was an envelope and it contained the weekly allowance, but that he never saw the money; that as far as the witness knows, Josefa and Margot received no other visitors there.

Examined by counsel for the defendant, this witness testified that his relations with Josefa Colón were good; that after the death of Alberto, Josefa Colón, who resided in New York, wrote to him asking whether she could count on him and he answered as a matter of conscience that she could that he was willing to testify what he knew, to state the truth and nothing but the truth, just like he was doing; that she came on that account and the witness saw her; that when the employee came with the envelope to the house of Josefa Colón the witness knew it was the weekly allowance what the envelope contained but that he did not know the amount nor the kind of money.

Francisco Teissonniere testified, among other things, that he lived next to Josefa Colón; that he saw Alberto Tristani arrive there many times and that oftentimes he went to that house because he was acquainted with them; that Tristani invited him sometimes to go to their house and

knew that they cohabited; that Tristani lived there with Josefa Colón just as if she were his mitress; that he got there in horse carriage, in automobile, during the day, during the night, at any time; that he knew that Josefa Colón was the mistress of Tristani, and that she was pregnant and Tristani told him: "I am going to have a baby"; that he wanted the baby to be a boy and not a girl; that the witness moved from the house in which he lived in 1923 but that he thinks the child was born in 1924. He was questioned by counsel for the defendant if he knew whether Josefa and Margot had any nickname and answered that the father of those ladies used to sell sugar-cane juice (*guarapo*) in the market place and people used to call him *"Guarapito"* and sometimes they said: "There comes *Guarapito,"* referring to the father of the ladies; that he does not know of any nickname given to the girls; that Josefa Colón lived with Pipe Maldonado; that he does not know when these relations ended, although he knows that they ended; that he saw Alberto Tristani around that place about the year 1920 and in the house of Josefa in 1922 and that during the years 1920 to 1922 the witness lived next to her; that Josefa Colón lived with her younger sister and with an elder one called Margot; that Alberto Tristani went to the house of Josefa Colón in 1923; that he saw Peyín there oftentimes; that Tristani went there in a horse carriage,. in automobile or in the bus they used for selling cigarrettes, during the day and at night, nearly every day; that sometimes the witness saw Tristani early, at 8 or 9 o'clock and on other occasions saw him at 12, and that oftentimes he saw Tristani come out, because the witness was himself somewhat of a wanderer.

Emilio Gazard testified, among other things, that he was acquainted with Alberto Tristani for the last 16 years; that he is a hackman and took Don Alberto to Victoria street, to the house of Josefa Colón; that he stopped the carriage in front of the house; that sometimes the witness waited for him an hour, and sometimes he told the witness:

"go ahead and come back for me"; that this happened in 1922 or 1923; that he remembers that one night, about seven, Tristani was coming by way of Marina Street and before going into the club, told him: "Take this to Josefa," adding, "I am not going there because it is late," and that he took that to her house on Marina Street; that when he took Tristani to the house of Josefa, he used to tell the witness: "Go ahead and come back for me at 2, at 1"; that as Tristani came out of the house Josefa Colón came to close the door; that he remembers that in 1923 he reached the house of Josefa Colón on a certain day and as he was very intimate with them he went in and Tristani told him: "Come here, Emilio, don't fail to come back for me at half past one," and Josefa Colón was sitting on a rocking-chair; that the witness answered: "Don Alberto, you are going to have a baby," and that he replied: "That is what they say," and she commented: "That is not what they say, you are going to have a baby"; that the witness then commented: "I bet it will be a girl," and Don Alberto replied: "That is something I would not bet with anyone," and the witness left and went for him later; that he saw the child after it was born; that Alberto Tristani took him to the house; that when he stopped the car Tristani told him: "Come down and take a look at the baby "; that he was very intimate with Tristani and the latter treated the child as his son; that Tristani told him that the child was his son and sent him things from the drug-store on several occasions; that Tristani gave the witness bay rum which he was to take to her for bathing the baby. Examined by counsel for the defendant the witness replied that the only thing he can state is that Alberto told him that the child is his son, but that he can not state positively that the child was the son of Alberto Tristani; that he took no one else to the house and that he saw no other men there.

Emilio Márquez testified that he is a commercial agent; that he knew Alberto Tristani since he was a child and that he became acquainted with Josefa Colón during a certain

transaction that she had about a house that he sold her; that he had a house on Vives Street which Josefa Colón saw, and told him to see Albertito Tristani; that he went to see Albertito, agreed about the house for $450 with the lot; that Tristani told him that he only had $250 and that he would give the witness a note for $200 if the witness accepted it; that then he went to the bank, spoke about the transaction and they accepted it: that he sold the house to Josefa Colón and it was paid by Alberto Tristani who told him that he had a son with her; that he does not remember when that happened; that he thinks it was three or four years ago, more or less; that he insisted on getting the discount; that he spoke with Toñito and Toñito discounted the obligation; that he said that he did that because he did not want to leave that child unprotected; that is was his son; that the deponent told him that he had another house of a higher price and that he answered that he could not buy because he had bought recently a lot on Villa Street and that he would buy that small house first and later would make certain additions to it; that Tristani made the statement that he had a son with Josefa Colón and that he did not want to leave the child unprotected so publicly, that the witness was in the office of Albizu Campos and if Albizu were in Puerto Rico he would perhaps corroborate what happened; that morally he sold the house to Alberto and legally to Josefa Colón.

Felipe Maldonado testified, among other things, that he knew Alberto Tristani and Josefa Colón; that he always saw him enjoying good health, walking like any other person; that Josefa Colón lived exactly in front of the entrance to his house on Petardos Street and that on different occasions he saw Alberto Tristani there; that he saw Tristani get there in a horse carriage, on two or three occasions, coming down by his own feet; that that happened at night largely; that during the day the witness saw him pass by, but never saw Tristani enter the house, and at night saw him several times. Examined by counsel for the defendant the witness answered

that he has been acquainted with Josefa Colón since the year 1920; that the Felipe Maldonado who lived with Josefa Colón is the deponent himself; that he knew her intimately. Questioned by counsel for the plaintiff the witness stated that it was his opinion that since 1921 he had not cohabited with her again; that since 1921 he has had nothing to do with her; that he lived with her for about eight or ten months.

Victoria Carrillo testified that she is the widow of Casals; that she lives in Ponce and that she is a midwife; that as such midwife she attended Josefa Colón around the month of January, 1924; that Alberto Tristani paid her for the services rendered to Josefa Colón; that he paid for these services personally; that she is a licensed midwife; and that in her professional capacity she attended Josefa Colón and sent the account to Tristani; that she went to his office, presented the account and Tristani paid it. This is so far the evidence presented by the plaintiff. We shall now see the evidence offered by the defendant.

The defendant Julia Quesada testified that she never knew that Alberto Tristani had a child; that Alberto never told her and he used to tell her everything; that in 1922 or 1923 Alberto Tristani always felt dizzy, had eye trouble and was unable to see, felt something like flies crossing in front of his eyes and saw double; that he was greatly worried about that; that he felt a sort of cold on his feet and through his back and used to tell the witness that he was feeling very ill, and then he improved a little and left for his office; that he felt headaches also; that Alberto Tristani died in Philadelphia in the year 1926; that he left for said city with Doctor Clavell and a nurse because he was very ill.

Nicolás Jiménez, witness for the defendant, testified, among other things, that Josefa Colón lived with a sister, Margot, and that men used to go to their house; that these sisters were known by the nickname of *"Guarapito"*; that the witness remembers having gone to that house several times; that he went there with a hackman whose name is

Atilano, on some occasions and on other occasions with other chauffeurs; that this happened around the month of February, 1923; that the friendship between the witness and Josefa was that of a client, that she was a woman where one could go as a passenger, as a visitor, and that then they used to go out with anyone and cohabited with anybody; that if he remembers correctly he went to their house once or twice with Atilano but that he is unable to state the exact date; that he can not tell exactly how many times he went there; that he went there once with a friend called Pedro Martínez, from San Juan; that most of the times he went alone; that Pedro Martínez was his friend, a carpenter, from San Juan, and that the witness does not know whether he is in San Juan or whether this man is dead or alive; that at present he is a carpenter for the partnership Succession of Alberto Tristani; that it is not true that he told Leopoldo Tormes that that child is the son of Alberto Tristani and that as far as he knows, Josefa Colón cohabited with Tristani as a public concubine and that the child is a product of these relations.

Witness for the defendant, Atilano Gary, testified, among other things, that he is a hackman, that he became acquainted with Josefa Colón around the year 1923; that he used to take passengers, very often, late at night, to the house of said Josefa Colón and that as it was not possible at times due to the neighbors, and so on, he advised her and she came out and walked to the house of a lady known as Marcelina; that both sisters went to that house; that he took Alberto Tristani there; that these facts occurred in 1922 to 1923; that he also took to the house of Josefa Colón several persons, commission merchants from the island who inquired from the witness whether he knew of any pretty girls; that friends from the Island went to the house of Josefa Colón, like Alberto Tristani, who went also; that these persons went to the house, came out an hour later, and that the witness left them there and later went for them; that the said persons told him to take them to the house of the "*Guarapito*" girls;

that they were nice girls for a good time; that these persons went there to have a good time and that by a good time he means to have sexual intercourse; that he does not remember the persons he took to the house of Josefa Colón; that he took Alberto and Nicolás Jimenez, whom he took out for a ride one night; that he does not remember anyone else; that Marcelina is a colored woman who has a bawdy house.

Witness Antonio Iglesias testified, among other things, that he passed by the house of Josefa Colón and saw her there with her sister and that there were always men in that house; that he went out for a ride with Josefa Colón and her sister; that that happened in 1923, in the month of May, something like that; that he does not remember the day of the week nor the date of the month; that this happened in 1922 to 1923; that during that ride they went towards the beach, towards the seashore, to "Los Meros" baths and that they also went to Quintana. Questioned as to whether this was a ride merely to look at the lanscape and the trees, he answered: "I went out for something"; that he had sexual intercourse with Josefa Colón; that he left from half past seven to eight and that he went with her to "Los Meros" baths and to Quintana baths; that he arrived at Quintana baths about half past nine and that there was an old man, a watchman, whose name he does not remember; that the car he used was a public one belonging to himself.

Antonio García testified, among other things, that he is a hackman; that during the years 1922 to 1923 he went to the house of Josefa Colón to take some boys about half past nine; that those chaps told him to go back for them about eleven or half past eleven and that he went for them at that time; that as soon as they went in they closed the door; that Josefa Colón and her sister were known as the *"Guarapito"* girls; that he remembers that it was on a Friday that he took these persons to the house of Josefa Colón, during the year 1922 to 1923, but that he does not remember

the exact month or year; that the only thing he knows is that it was on a Friday that he took those people there.

This is the evidence adduced by both parties, with the exception of the evidence in rebuttal and the expert evidence which we still have to examine.

In its holdings of fact, the lower court states that it has not been shown that Alberto Tristani lived in concubinage with Josefa Colón, but it considers as shown that the latter, during the years 1922 to 1924 was the mistress of Alberto Tristani and that he visited her with some frequency at night.

The lower court stated that the plaintiff, Josefa Colón, prior to Tristani, was the mistress of Felipe Maldonado and that although she had relations with Tristani she was visited in her house by other men. "Antonio García and Atilano Garay," the court a quo went on saying, "testified that during the years 1922 to 1923 they used to take passengers to the house of the plaintiff, who lived with her sister Margot, and who were known as the 'Guarapito' girls and that the reputation they enjoyed was that they admitted men to have intercourse with them, Caray testifying that Tristani was among the persons he took there several times. Antonio Iglesias also testified that during the years 1922 to 1923 he lived close to the house of the plaintiff and that he went out with her in the year 1923 to 'Los Meros' baths and to 'Quintana' baths and that he had sexual intercourse with the plaintiff."

And the lower court adds: "It is true that both the plaintiff and her witness Fortier denied these facts in rebuttal, but the plaintiff is an interested party, and as regards Mr. Fortier, the court does not doubt the good faith with which he testified, but it can not forget that he was the lover of the plaintiff's sister, against whom a similar imputation was made."

The court below does not doubt the good faith with which Fortier testified but it could not forget that he was

the paramour of a sister of the plaintiff. The evidence shows that Pedro Fortier had a love affair with a sister of Josefa Colón, for some time, while Tristani also had relations with the plaintiff. These relations of the witness Fortier with the sister of Josefa Colón, who lives now in New York, ended some time after the birth of the child whose paternity is attributed to Alberto Tristani. When Fortier testified, these relations had ended some years before. In our opinion, the relations of Fortier with the sister of the plaintiff, besides being too remote, can not serve as a basis for considering his testimony as that of an interested party. The lower court admits the good faith of Pedro Fortier in testifying, but in weighing the evidence gives credit to the hackmen who testified about the reputation of Josefa Colón and does not take into consideration the testimony of Fortier. A witness who testifies in good faith may make mistakes, may show interest in the success of the party who is offering his testimony and may even commit exaggerations. All this is humane and may be, and ought to be, taken into consideration by the trial judge, but if the witness alters the facts to such an extent that he lies, it is evident that he does not testify or act in good faith. The testimony of Fortier is in open contradiction with the testimony of the witnesses for the defendant. If the latter state the truth, Fortier did not, and vice versa. We shall transcribe in its entirety, the testimony of Pedro Fortier, impeaching the evidence for the defendant about the reputation of the plaintiff:

"Plaintiff: It has been said here that in 1922 to 1923—it has been stated here that a hackman whose name is . . . . . . a hackman by the name of Atilano Garay. . . .

"A. I known him.

"Q. By another known as Antonio García. . . .

"A. If the nickname given to him is "Juana Díaz," I known him also.

"Q. Is Antonio García here in court? (The person referred to is shown to the witness).

"A. Exactly, 'Juana Díaz.'

"Q. And by another whose name is Antonio Iglesias. . .

"A. I known him also.

"Q. It has been alleged by them that in the year 1922 and in the year 1923, Josefa Colón and her sister Margara Colón were known in the community where they lived as women of bad reputation, as prostitutes; that men went to their house as a house of ill fame, that they took many people there at night, waited for them or left, and then came back for them late at night, and that on other occasions Josefa Colón went to the house of a certain woman known as Marcelina, that she went there, and that on other occasions they went joy riding in automobile with these girls. From the knowledge that you have with respect to Josefa, in the house where she lived on Victoria St., can you tell the court whether that is true or not?

"A. That is absolutely false; that is an infamy from end to end. Josefa Colón, especially Josefa Colón, has been a woman of the highest morality in that respect. While she cohabited with Alberto Tristani, and prior to that, because I understand that before that, long before that, she was the mistress of Pipo Maldonado, she was a woman of the highest morality. I am their neighbor and as I am a bachelor I go everywhere, have friends, talk to them and with lots of friends of Alberto Tristani, who were my friends also and never have I heard of that, neither because I was told or because I saw anything with my own eyes. As to her sister, Margot Colón, my opinion is somewhat different; she is older and before that she was a woman who had a lot a paramours and I am not sure whether she did anything of the sort, but during the time that I went to their house, which was three years more or less, I would not have allowed that either, because I, with the modest means I had, furnished her with everything that was necessary; and she had younger sisters for which I am sure she had the highest respect, and none of those rascals had opportunity to. . . .

Defendant: I pray that the word 'rascals' be stricken out; the witness is not the marshal of the municipal court on this occasion; he is a mere witness, and nothing else.

Judge: Let that word be stricken out.

Plaintiff: Yes, let it be stricken out.

Defendant: I wish to state that the witness is confessing a federal crime which is applicable to Puerto Rico.

Plaintiff: Which crime?

Defendant: Fornication; that has been decided by our Supreme Court.

Judge: That is a different proposition.

Defendant: Have you any interest in this case or not?

Witness: Personally, absolutely none—that is a question of conscience.

"Q. At present, where do you spend your leisure hours?

"A. My leisure hours?

"Q. Don't you call on Josefa Colón at present?

"A. Not even a single time in the afternoon; I have gone to see her in the evening once in a while because she is a person that I have known for many years.

"Q. But you were the paramour of Margot Colón and you feel some gratitude towards them?

"A. Gratitude?

"Q. Towards Margot, the sister of Josefa.

"A. Personal gratitude? None. That is finished.

"Q. Finished?

"A. Yes, sir.

"Q. Who wrote to Josefa Colón that Alberto Tristani had died? Did you not do that?

"A. I don't know anything about that, sir, it was not me.

"Q. Are you sure of that?

"A. Absolutely sure."

This is, so far, the testimony of Pedro J. Fortier, adduced by the plaintiff to contradict the testimony of Nicolás Jiménez, Atilano Garay, Antonio Iglesias and Antonio Carcía.

The testimony of Nicolás Jiménez was impeached by that of witness Leopoldo Tormes, who testified that on a certain day he met Jiménez ,who was his friend and a good person, and that the latter told him that the son of Josefa Colón was also the son of Alberto Tristani and that he was willing to appear in court to prove that. Jiménez denied that he had this conversation with Tormes, adding that he spoke with the latter a couple of days before the trial; that Tormes asked him whether he would testify, and tried to find out what his testimony was going to be; that the witness told him part of his testimony and that the answer that Tormes gave him was; "It seems incredible that you should be

willing to testify in favor of the wealthy and against the poor''; and that the witness answered that that was a matter of conscience; that he had an argument with Tormes, the witness maintaining that he never had that conversation with him and that Tormes replied: ''I am leaving, and the consolation that I have is, that between a lie told by you and a lie told by me in court, mine deserves more credit.''

The court admitted in evidence an opinion rendered by Judge Todd in a divorce proceeding brought by Magdalena Rodríguez against Nicolás Jiménez. In this opinion Judge Todd says that the nervous and uneasy manner in which Nicolás Jiménez testified led the court to the conviction that the witness was lying and so made it appear in the notes taken the day of the trial.

It is to be noticed that the witnesses who testified that they took men to the house of Josefa Colón mentioned no one residing in Ponce, except Alberto Tristani. Nicolás Jiménez said that he took there a man named Pedro Martínez, from San Juan, whom the witness does not know if he is dead or alive. Atilano Garay states that he took Nicolás Jiménez and Alberto Tristani and several commission merchants from the island and that he does not remember the names of the persons he took to said house. If the testimony of these witnesses were accepted as true, it must be admitted that Alberto Tristani, who, as the lower court admits, gave money to his mistress, the plaintiff, paid the services of the midwife who attended her, paid the rent of the houses jointly with Mr. Fortier and, we add, bought a house for her and visited her frequently, patiently tolerated his mistress to be at the disposal of other men with whom he would have to meet during the frequent visits he made to the house. Witness Atilano Garay said that Alberto Tristani was among the persons he took to the house. It does not seen natural that a man who had a mistress and cared for her like Tristani cared for Josefa Colón, would then allow the scenes mentioned

by the witnesses for the defendant to take place in the house for which he was paying.

Witness Antonio Iglesias testified that he went out for a ride with Josefa Colón and her sister; that he went out with her for something; that they went to "Los Meros" and "Quintana" baths and that he had sexual intercourse with the plaintiff. When the witness says that he went out for something he seems to give the impression that he made use of the ride a as means of succeeding in having sexual intercourse with her. If it is true that the plaintiff received men in her house, as stated by the witnesses for the defendant, there was no need for Antonio Iglesias to take her out for a ride in order to have sexual intercourse with her. He could have done what he desired in the plaintiff's own house.

We have read and examined carefully all the evidence adduced before the lower court and after comparing the testimony of Pedro J. Fortier with that of the witnesses for the defendant, we see why the trial judge did not doubt of the good faith of Pedro Fortier in his testimony, but we are unable to explain why his testimony should be discarded by the fact that he had an affair with a sister of the plaintiff some years before, and that the testimony of the witnesses for the defendant about the reputation of the plaintiff should have been taken into consideration. It will suffice to examine this evidence cooly and calmly in order that an acute sensation of doubt may arise in the mind of the trial judge with regard to the veracity of these witnesses, whose testimony is in conflict with that of Pedro Fortier.

It is true, as the court said, that the plaintiff, prior to Tristani, had a love affair with Felipe Maldonado. The plaintiff herself admitted this illicit affair, while she was examined by her own counsel. The court adds that witness Petrona Suárez, for the plaintiff, testified that even during the life of Tristani the plaintiff went to New York to live and that she had been there for about two years and had a son

from another man. This conclusión of the court does not
seem justified by the evidence, although this is a fact which,
if true, occurred several years after the child Alberto Colón
was engendered, but as the court below took it into considera-
tion in order to question the morality of the plaintiff, we
shall transcribe what Petrona Suárez said:

"Plaintiff: How long has Josefa Colón lived in the United States?
"Two years.
"With whom did she live in the United States, if you know?
"I don't know.
"Did she have a child there?
"Now, that she may have taken a husband; but when she left,
she left alone—that is different."

This is all the evidence appearing in the record with
regard to the conclusions established by the lower court. We
do not affirm or deny it, but we maintain that the above state-
ments of Petrona Suárez do not justify in any wise the con-
clusion reached by the court below; that the lower court laid
great stress on this evidence is shown by the following con-
clusions:

"If we take into consideration all the facts connected with the
life of the plaintiff, that before having that affair with Tristani she
was the mistress of Maldonado and that while she lived with Tris-
tani she left her son in Puerto Rico and sailed for New York and
there had another child from another man, and that there she lived
on October 20th, 1928, when Alberto Tristani died in Philadelphia, it
must be agreed that the court can not give credit to the alleged
morality of the plaintiff and that the evidence for the defendant,
mentioned above, establishes a strong doubt in the mind of court as
to the veracity of the evidence for the plaintiff."

As to the testimony of the experts offered to show the
impotency of Alberty Tristani at the time of the conception
of the child Alberto Colón, the court below states that it
ignored this evidence in establishing its conclusions. The
court states, furthermore, that although it has decided the
case on other grounds than those alleged in the special de-
fense, absolute credit is given to the testimony of the expert

witnesses, Doctors Mariano Riera and Luis C. Clavell, whom the court deems incapable of fabricating what in the briefs for the plaintiff is called an artificial· medical alibi, and avails of this opportunity to call the attention of counsel that they should refrain in her briefs from making imputations of a personal character to their colleagues and that they should limit themselves to a serene and impartial discussion of the facts and of the law involved in the case.

We have respect for the opinion of the lower court as to the credibility deserved by Doctors Riera and Clavell. It must be agreed that expert testimony is one of the most difficult and complicated sorts of evidence to lead the mind of the trial judge to a conclusion. This evidence, owing to the factors therein intervening, is received with caution by courts of justice, which being cognizant of human frailty, know that even the most honest experts are unconsciously influenced by the party offering their testimony and who generally pays with liberality their efforts and services. Nevertheless, this expert testimony, by its nature, has deserved our most earnest and careful consideration.

Doctor Mariano Riera testified that around the months of July and August, 1923 he was consulted by Alberto Tristani, who informed him that for some time he had been suffering from syphilis; that his blood had been examined several years before and the result had been positive; that he had submitted to a treatment some time ago and that some manifestations had already presented and that he wanted to submit to a treatment in due form. The expert testified here that the symptoms of the illness suffered by Tristani suggested to him the possibility of a diagnose of cerebrospinal syphilis; that these symptoms were anesthesia in certain regions, especially in the legs, weakness in the legs and in the muscles of the legs, neuritic pains in the legs, certain unevenness in his pupils, the right pupil being smaller, falling of the eyelid, of the same side also, and tosis of the eyelid; and besides, the manifestations of Tristani, who com-

plained that for some time his sexual functions had been abolished; that absolute impotency existed, inability to have sexual intercourse, which was one of the things that worried him most. Taking these symptoms as a basis, Doctor Riera reached the conclusion that Tristani was suffering from cerebrospinal syphilis, as he later was able to ascertain during the course of the disease.

We shall not transcribe here the whole of the testimony of Doctor Riera, because it is quite extensive and would fill a number of pages. We shall limit ourselves to the evidence referring to the impotency attributed to Tristani.

It has been shown that Alberto Tristani died of meningitis of syphilitic origin and that the cerebrospinal syphilis was a contributory cause of his death.

Answering questions of counsel for the plaintiff, Dr. Riera said that sexual impotency is inherent to cerebrospinal syphilis, that it is one of the symptoms of the disease.

We copy the following from the examination:

"Q. May the disease known as tabes dorsal exist without impotency, without an affection . . . . . ?

"A. In a certain number of cases it may exist, especially at the beginning; in the last phases it is that . . . .

"Q. Does it happen or not frequently, Doctor, at the beginning, that a person suffering from tabo-paresis, that his sexual desire, instead of diminishing, increases?

"A. There are cases in which that happens at the beginning.

"Q. Doctor, and a person suffering from syphilis . . . Does syphilis alone produce impotency to procreate?

"A. Not absolutely.

" . . . . . . . . .

"Q. It is possible, Doctor, that when you began to treat Alberto Tristani for the first time or for the second time he might have had sexual intercourse with a woman?

"A. As the symptoms he presented were subjective and in cases of this nature weakness may exist or not, it depends, as I said before, of the manner in which the patient is suffering from the disease, and I accepted as true what he told me about his impossibility, that it was impossible for him, those were his words, that it was impossible.

I took his word that he wanted those symptoms improved, as well as the other symptoms."

The following dialogue took place between the court and the witness:

"Q.   Tell me, Doctor, is there any form in which a physician may ratify the statement of a patient that he suffers from sexual impotency?

"A.   Well, I think so . . . no, I don't think so.

"Q.   The disease suffered by this patient of yours, was it a simple or a serious one?

"A.   It was a serious one.

"Q.   According to its results, is it one of the most serious diseases known?

"A.   According to its final results, it is one of the most serious diseases.

"Q.   And impotency was among the symptoms mentioned by him?

"A.   That was one of the symptoms that worried him most.

"Q.   Can you remember whether that impotency was absolute or whether he only had difficulty in having sexual intercourse?

"A.   He said that he could not have sexual intercourse.

"Q.   Was that in 1923 or was it . . .

"A.   As soon as I began to treat him; that was in 1923."

As we have seen, Dr. Riera informs us that in cases of cerebrospinal syphilis one of the symptoms is sexual impotency.   Doctor Potts tells us at page 411 of his work v"Nervous and Mental Diseases," that in cases of syphilis of the spinal cord the loss of sexual power is usually one of the earliest symptoms.   Doctor Cambell tells us, at page 293 of his work "Diseases of the Nervous System," that sexual power is generally greatly diminished or lost when the tabes dorsalis is fully developed, but that in its early stages it may be temporarily increased.   Doctor Potts tell us, at page 420 of the work cited, that in cases of paralytic dementia or paresis, an increase of sexual desire and vitality is manifested in the early stages of the disease.   Paresis affects the brain, tabes the spinal cord.   Tristani was suffering from tabo-paresis, that is to say from cerebrospinal syphilis.

Dr. Riera said that Tristani informed him that sexual impotency had appeared but that he did not remember when.

Consequently, it is not exactly stated when was it that Tristani said that the impotency of which he complained had begun. Dr. Riera's treatment began in July or August, 1923. The child Alberto Colón was born on January 16, 1924. He must have been conceived in the month of April, 1923. Dr. Riera himself tells us that sexual weakness might present itself or not in this case, referring perhaps to the early stages of the disease. When Tristani called on Dr. Riera for the first time the disease had not fully developed. Tristani died on October 20, 1928, five years and some months after the child Alberto Colón was conceived and of the first intervention had by Dr. Riera with the patient. Dr. Riera tells us that his basis is exclusively the statements of Tristani with regard to sexual impotency, inasmuch as this is a symptom of cerebrospinal syphilis. Dr. Luis Clavell, who accompanied Tristani to Philadelphia in the place of Dr. Riera, tells us that Tristani was examined by Dr. Rose, a medical celebrity, and by Dr. Clark, and that they all agreed that the disease was cerebrospinal syphilis. He informs us besides that the death certificate was signed by Dr. Clark in his presence. On this certificate signed by Dr. Clark in the presence of Dr. Clavell, it is stated that Tristani died from meningitis of a syphilitic origin; that this meningitis lasted a month and that the contributory cause was tabo-paresis which lasted four years. Even if we did not really give importance to these statements made in the presence of one of the physicians that attended Tristani, it is nevertheless an element of proof which might be taken into consideration in weighing the facts. If the tabo-paresis lasted four years and Tristani died in October, 1928, the disease began in 1924. This statement was made at a time when there was no suit pending or any interest which might have an influence in the statement of Dr. Clark. It is true that Dr. Riera tells us that he diagnosed the disease suffered by Tristani as cere-

brospinal syphilis in July or August 1923, but even admitting as true what Dr. Riera stated and not the statement made in the death certificate by Dr. Clark, we must nevertheless agree that the tabo-paresis was at least in its early stages when Tristani visited Dr. Riera.

The court considers as proved the fact that Josefa Colón was the mistress of Alberto Tristani. Mistress, according to the dictionary of the Spanish Academy is the woman who has illicit intercourse with a man. It has been shown besides that Tristani left the house of Josefa Colón late at night. She testified that in the year 1923, when she became pregnant, she had sexual intercourse with Tristani, who was a strong and potent man. Tristani's attitude at the time the child was born must also be considered as well as the fact that he paid for the services of the midwife who attended the plaintiff. With this evidence it is not possible to establish the conclusion that Tristani was impotent at the time of the conception of the child. His own acts show the contrary.

The testimony of the mother with regard to the sexual relations with the putative father is evidence admissible in courts of justice, where this kind of evidence has been admitted for many years. The fact that the alleged father is dead does not make the evidence incompetent, as alleged by counsel for the defendant. This is a circumstance which may be taken into consideration by the trial judge, added to the natural interest which a person is supposed to have in its own cause. The following citation from Corpus Juris shows the liberality reached with regard to the testimony of the mother:

"In the absence of a statute requiring corroboration, the jury may find that defendant is the father of the child on the sole testimony of the mother, provided they believe it to be credible. Where, however, doubt has been thrown on the credibility of prosecutrix's testimony, as by proof of sexual intercourse with another man about the time of conception, her uncorroborated testimony has been held insufficient,

but even in such a case her testimony may be sufficiently positive to sustain a verdict.'' 7 C. J. 994, 995.

Among the authorities cited in the notes to the above quoted text appears the case of *Michael* v. *State,* 57 Ind. 520, 108 N. E. 173, wherein several witnesses testified that they had had sexual intercourse with the prosecutrix at the time of the conception of the child. We quote from the opinion of the court in this case. ''She testifies positively that appellant is the father of her child, and that she had no intercourse with any other *boys* during April, 1911; her child, a full-term one, being born on January 27, 1912. Her evidence is sufficient to support the verdict, the jury must have believed her rather than defendant's witnesses, and, as we have no right to weigh the evidence, the verdict will not be disturbed on account of the insufficiency of evidence.''

Francisco Teisonniere, a witness for the plaintiff, testified that the father of Josefa Colón used to sell sugar-cane juice (*guarapo*) in the market place and people called him *''Guarapito''* and that he does not know of any nickname attributed to the girls. Witness Leopoldo Tormes testified that they were all known as *''Guarapito,''* because their father used to sell sugar-cane juice in the market place and everyone knew both the boys and the girls by this name.

Witnesses for the defendant stated that Josefa Colón and her sister were known as the *''Guarapito''* girls.

Four notes or writings were also presented in evidence addressed to Josefa Colón and signed by Alberto, as well as a photograph of Tristani which the plaintiff said had been given to her by the former. As regards the notes, Josefa Colón testified that she knew the handwriting of Alberto Tristani and that the writing on the notes was identical with that of Tristani. The defendant Julia Quesada and her employee Carlos Negrón testified that they knew the handwriting of Tristani and that there was no similarity whatsoever between his handwriting and that appearing on the notes. The lower court made no pronouncement on these

documents. In view of the conflict in the testimony of these witnesses we refrain from considering this evidence.

We have perhaps extended too much in examining and stating this evidence. We are of the opinion, however, that it was necessary to do so, given the nature of the case and the holdings of the court below. It is our opinion that the filiation of Alberto Colón has been satisfactorily established. The court below holds that Josefa Colón was the mistress of Alberto Tristani around the years 1922 to 1924, namely during the time in which the child Alberto Colón was conceived. The court below holds, moreover, that Tristani visited Josefa Colón frequently at night, gave her money and paid the rent of the house in conjunction with Mr. Fortier; that Tristani paid the fees of the midwife who attended Josefa Colón during the childbirth and that he executed certain isolated acts of affection toward the minor Alberto Colón. The court below says nothing about the house purchased by Alberto Tristani for Josefa Colón. The testimony of the vendor of this house, Emilio Márquez, is unimpeached and produces the impression that it is a disinterested testimony. This witness testifies that Alberto Tristani, at the time of paying the house told him that he had a son with Josefa Colón. The plaintiff testified also that the child was named Alberto because "the father said that he be given that name." These facts, added to the remaining details and circumstances appearing in the evidence, are in our opinion sufficient to declare Alberto Colón the acknowledged natural son of Alberto Tristani.

When a man and a woman live in concubinage and a child is born, the law establishes the presumption of a natural child, for it imposes on the father the duty to acknowledge him. It has not been shown in the present case that Tristani lived with the plaintiff in the same house. It was shown that Josefa Colón was his mistress. The mistress, the same as the concubine, has with his paramour or lover sexual intercourse. In both cases illegal sexual intercourse

is had. No legal presumption is established in the cases in which concubinage is not shown; but once illicit intercourse is established, a moral presumption arises as difficult to destroy as that in cases of concubinage. This presumption, corroborated and complemented with other evidence, like in the present case, acquires such a probatory value that it has to produce a strong impression in the mind of the court.

We have studied the decisions of this Supreme Court with reference to the condition as of a natural child. This court in its opinions weights the elements of proof presented in each case and their probatory value. These opinions are applicable to those cases in which the condition as of a natural child is in issue, independently from the intimate relations existing between the mother and the putative father; but when the sexual relations have been established and the presumption of paternity arises in the mind of the judge, this presumption, corroborated and strengthened by other acts of the father, may be sufficient for obtaining and entering a declaration of natural child. It would be an unjust law that in which after the existence of a father is shown, the means are not given to compel him to assume the responsibilities contracted with the child by him engendered. That could not have been the thought of the Legislature; that can not be the spirit of the provisions of section 193 of the Civil Code.

For the foregoing reasons we are of the opinion that the judgment appealed from should be reversed and that Alberto Colón should be declared the acknowledged natural son of Alberto J. Tristani with all the rights inherent to his filiation. The judgment rendered by the District Court of Ponce under date of December 8th, 1928, declaring the defendant Julia Quesada Mandry, widow of Tristani, mother of Alberto Tristani, sole and universal heir of Alberto J. Tristani, is hereby set aside, without special pronouncement of costs.

Mr. Justice Wolf and Mr. Justice Aldrey dissented.

Mr. Justice Aldrey, dissenting.

The complaint in this case was presented. by Josefa Colón as mother of her minor son Alberto Colón, is addressed against the mother of Alberto J. Tristani, as his sole and universal heir, and its object is that her son be declared the acknowledged natural son Alberto J. Tristani, for these two reasons: 1, that he was engendered and born while his mother lived in concubinage with Alberto J. Tristani, while both were single; 2, that the said minor enjoys the uninterrupted condition as of a natural son of his alleged father, justified by the acts of the latter. The nullity of the declaration of heirship made in favor of Tristani's mother is also sought.

The judgment rendered herein by the lower court dismissed the complaint and this appeal was taken.

Concubinage is the cohabitation by a man and a woman, who, being single, live in the same house just as if they were husband and wife. It is a status similar to that of the marriage but without the celebration thereof. As we said in the case of *Medina* v. *Heirs of Bird,* 30 P.R.R. 151, the concubinage to which the Civil Code alludes, refers to the condition of a man and a woman living as husband and wife without being really married, it being insufficient for the existence of a concubinage that a man have a woman in a house and visit her frequently, if the man has his own and independent home. As this Court said in the case of *Gerena* v. *Heirs of Suau,* 36 P.R.R. 151, when a man lives in a house different from that of a woman with whom he has sexual intercourse, concubinage does not exist even though he visits her in certain occasions.

In the present case it appears from the evidence that Alberto J. Tristani and Josefa Colón, mother of the minor in whose name the complaint for filiation is brought, did not live together in a house as husband and wife, but on the contrary, that at the time in which the child was engendered and born, Tristani lived, and had his home, in the house of his mother; Josefa Colón living in another house in the com-

pany of a sister who was the mistress of another man; and that Tristani visited Josefa at night and left for his house about one o'clock in the morning. This evidence, which was unanimous, does not show the existence of a concubinage between them, but solely that Josefa Colón was the mistress of Tristani.

The opinion which serves as basis to the judgment of the majority of this Court, in reversing that of the court below, admits that Tristani did not live in concubinage with the mother of the minor, and says that Josefa Colón was the mistress of Tristani; and although that does not establish a legal presumption of paternity when concubinage is not shown, once illegal sexual intercourse is established, a moral presumption arises so hard to rebut as in cases of concubinage. In other words an attempt is made to consider the relations, of a man with his mistress as equivalent to the status of concubinage, with a presumption not existing in law.

The secret of paternity has compelled the law to make use of presumptions with regard to the children and for this reason those born during the marriage have the presumption that they are the children of the husband and those engendered and born during concubinage enjoy the presumption in our law that they are the children of the paramour, owing to the similarity existing between both status, but the law has not considered the children of a mistress similar to those of a concubine. The law has even admitted that the children born from the concubinage are the children of the paramour, but it has not gone beyond that, nor declared that the children of a mistress are the children of the man who has sexual intercouse with her. Who can presume in law who is the father of the children of a woman who does not live with a man under the same roof? Consequently, from the fact that a man has sexual intercourse with a woman as his mistress, no presumption arises, not even a moral one, unknown to the law. Concubinage is easy to prove, but it was not shown in this case. For a concubinage, the same as for a marriage,

the evidence with regard to the legal status of the children is the marriage alone or the state of concubinage and in either case it is unnecessary to prove sexual intercourse, because the law presumes it. Consequently, evidence of sexual intercourse between a man and his mistress creates no presumption of paternity in so far as the man is concerned.

Evidence of the uninterrupted condition as of a natural child of a man is more difficult. In several cases we have held that such evidence should be strong and convincing, and it should be understood that it must be so, because it tends to introduce in a family and in an estate, a person which is not a part thereof until by judgment he is declared to be the natural son of the father imputed to him. And in cases like the present, in which the person to whom paternity is attributed is dead, evidence should be considered with caution because it should be borne in mind that it is difficult, if not impossible, for the heirs of the alleged father to contradict the words and deeds attributed to the alleged father. *Torres* v. *Heirs of Caballero,* 39 P.R.R. 654. This does not mean that after the death of the alleged father it may not be held that a person is his natural child by reason of the acts and statement of the alleged father, but solely that evidence of that kind should be examined and weighed with great care.

The affair between Tristani and Josefa began in 1922; on January 16, 1924, the child in whose name the complaint is brought, was born; these relations ended in 1924 and Tristani died in October, 1928; consequently, the child was a year old when said relations concluded.

Alberto J. Tristani paid half of the rent of the house in which Josefa Colón lived and paid for a small house which she bought; these being acts which do not imply an acknowledgment of the child born, but only the support and welfare of his mistress. The payment of the fees of the midwife who attended Josefa, by itself is neither an act of acknowl-

edgment of the paternity of the child. Some witnesses testified that Tristani told them that the child had by Josefa Colón was his son. The lower court, which heard the witnesses testify and saw the manner in which they expressed themselves, was in a better position than this court to weigh their credibility, and in our opinion a manifest error has not been shown which would justify the reversal of the judgment rendered by it. As a general rule, in cases like the present we do not reverse the conclusions reached by the lower court, as we said in *Mercado* v. *Heirs of Mangual,* 35 P.R.R. 388, wherein we cited the cases of *Castro* v. *Quiñones,* 29 P.R.R. 692 and of *Montalvo* v. *Montalvo,* 25 P.R.R. 800. The fact that the lower court did not doubt the good faith with which the witness Fortier testified, although saying that it could not forget that he was the paramour of Josefa's sister, and the fact that at the time he testified said relations had ended, is not by itself a ground for reversing the judgment. And neither that the court stated that Petrona Suárez testified the Josefa Colón had had a son in New York after her relations with Tristani ended, when this does not appear from her testimony, for the manner in which she answered, judging from the record, could have led the court to believe that that was a fact, although she refrained from saying so.

With the evidence presented regarding the acts and statements of Tristani and with the weight given to it by the lower court, I am of the opinion that the judgment appealed from should not have been reversed.

I shall not go into the evidence of reputation, and just like the court below, I am not considering the evidence given by the physicians.

I am authorized to state that Mr. Justice Wolf concurs in this opinion.